IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BEN SANDERS, JR.,

                              Plaintiff,                        OPINION AND ORDER

    v.

                                                                        08-cv-716-slc

ALFONSO GRAHAM, Chair,
    Wisconsin Parole Commission, and
JAYNE HACKBARTH, Commissioner,
    Wisconsin Parole Commission,

                             Defendants.

---

Plaintiff Ben Sanders, Jr. is serving two consecutive life sentences for shooting and killing two Milwaukee police officers in 1973. Although Sanders has served enough time to be eligible for parole, has completed prison programming and has behaved well in prison, Wisconsin's Parole Commission repeatedly has declined to release him, resulting in imprisonment measurably longer than most other lifers sentenced around the same time. Sanders attributes his prolonged incarceration to parole statutes and regulations promulgated after he was sentenced. He brings this civil rights action under 42 U.S.C. § 1983, claiming that the retroactive application of these new rules in his case violates the ex post facto clause of the United States Constitution.

Before the court are the parties' cross-motions for summary judgment, dkts. 66 and 72. I am granting summary judgment in favor of the defendants because Sanders has not shown that his continued imprisonment is the result of statutory or administrative changes as opposed to changes in how the parole commission legitimately exercises its discretion,

The following material facts are undisputed for the purposes of deciding the motions for summary judgment:

FACTS

Plaintiff Ben Sanders is incarcerated at the Fox Lake Correctional Institution in Fox Lake, Wisconsin. Defendant Alfonso Graham is the current Chairman of the Wisconsin Parole Commission. Defendant Jayne Hackbarth is a former commissioner on the Wisconsin Parole Commission.[1]

In 1973, long before Wisconsin instituted its current determinate sentencing scheme, plaintiff was convicted of two counts of first degree murder for shooting and killing two Milwaukee police officers. The court imposed two consecutive life sentences *with* the possibility of parole.

In 1973, parole decisions were made by the parole board, which was part of the Department of Health and Social Services. Members of the parole board were full-time civil servants. Then, as now, if the parole board denied release, it specified a time period that must elapse before the inmate could have his next parole review. Under the policy at the time, such "deferrals" were capped at 12-months.[2]

According to a 1981 report written by former parole board chairman Fred Hinickle, varying lengths of deferrals were given for the following reasons:

       1-2 months: informational purposes;

---

[1] After this lawsuit was filed, the Wisconsin Parole Commission was renamed the Earned Release Review Commission. For clarity, I refer to it in this opinion as the parole commission or the commission.

[2] Some of the evidence adduced by plaintiff indicates that 24-month deferrals were allowed even before promulgation of the administrative rules in 1981. *See, e.g.,* PPFOF 53 (citing June 24, 1977 correspondence from parole board vice-chairman Ralph Collins to Robert Ellsworth, Acting Director of the Bureau of Institutions, dkt. 84, exh. G, at 3-4). Nonetheless, because plaintiff cannot succeed even if the 12-month deferral cap had been firmly in place at the time he was sentenced, for the purpose of deciding the summary judgment motions I am giving plaintiff the benefit of the doubt and finding that the board used only the shorter deferral period.

>3-9 months: parole appears reasonable;
>
>10-11 months: inmate has made progress, but it is not implied that parole is probable at the next hearing;
>
>12 months: inmate has not served enough time on his sentence or has made few, if any, gains, or has many conduct reports, since his last parole appearance.
>
>Fred Hinickle, *Parole in Wisconsin, Past, Present and Future*, January 1981, dkt. 79, at 60.

The report noted that

>Institutions consider parole deferral patterns when making security reductions, and deferrals of less than 12 months often make an inmate eligible for certain programs, such as work release. A security reduction allows the board to examine the inmate in a reduced security setting.
>
>*Id*.

In 1981, administrative rules were promulgated to govern the parole board. Among other changes, now the board could defer a prisoner's parole hearing for more than 12 months upon written approval of the Secretary of Health and Human Services, the Secretary's designee or the parole board chairperson. That rule, which now is codified at Wis. Admin. Code § PAC 1.06(2), provides that:

>Parole consideration for persons denied parole shall occur no later than the last day of the calendar month prior to the consideration date established by the commission. Reconsideration shall not be deferred for longer than 12 months except with the written approval of the chairperson or the chairperson's designee.
>
>*Id.*

In 1989, the Wisconsin Legislature replaced the parole board with an independent parole commission headed by a chairperson appointed by the governor to a two-year term. 89 Wis. Act. 31. With the exception of the chairperson, the commissioners were (and are) hired through

the civil service system. Currently, there are eight commissioners, including the chairperson. Wis. Stat. § 15.145(1).

When an eligible inmate is scheduled for a parole hearing, the assigned commissioner–or in some cases, a panel of commissioners–interviews the inmate, reviews his file, applies the administrative criteria[3] and makes an initial recommendation whether to grant or deny parole and how long to defer the next review. Wis. Admin. Code §§ PAC 1.06, 1.07. Then the chairperson reviews the file, applies the same criteria, and decides whether to accept the recommendation. Wis. Admin. Code § PAC 1.07(3). Under Wis. Admin. Code § PAC 1.07(5)(b), the chairperson or his designee may grant or deny parole at any time if there are extraordinary circumstances.

The commissioner in charge of a specific parole hearing "may, with the approval of the chairperson, refer the case to the full commission for a decision." Wis. Stat. § 15.145(1); Wis. Admin. Code § PAC 1.07(2). The current chairman, defendant Graham, has never denied a commissioner's request for a full board hearing.

Under the new parole rules, the parole commission must provide crime victims the opportunity to attend a parole interview of the applicable inmate and to make a statement at that interview. Wis. Stat. § 304.06(eg). Alternatively, victims may provide direct input into the decision-making process by submitting a written statement or meeting with a commissioner in advance of the interview. Wis. Stat. § 304.06(em).

---

[3] In accordance with the various requirements of Wis. Stat. Ch. 304, parole consideration is based on these criteria: 1) the inmate's statutory eligibility; 2) sufficient time for punishment (taking into account the type of crime, the inmate's role and reasons, his current feelings, length of the sentence, the attitudes of the judge and the prosecutor); 3) his institutional adjustment and participation in programs; 4) adequacy of the parole plan; and 5) whether release would present an unreasonable risk to the public.

In some cases in which it defers an inmate's parole, the parole commission will recommend that an inmate's security level be reduced. An inmate's security classification is determined by the Program Review Committee, which is part of the Department of Corrections and operates independently of the parole commission. In making custody classifications, the Program Review Committee may consider "parole commission actions and stated expectations," but it is not bound by any decisions or recommendations made by the parole board and need not even consider them. Wis. Admin. Code § DOC 302.07.

In 1994, Sanders became eligible to be considered for parole because he had served 20 years of his sentence. Wis. Stat. § 304.06(1)(b) (2010) (formerly codified at Wis. Stat. § 57.06). At Sanders' first hearing, the commission denied parole and deferred Sanders's next hearing for 24 months. In 1996, Sanders again was denied parole and given a 48-month deferral. The parole commission reviewed Sanders's case in 2000, then in 2002, 2004, 2006 and 2008, each time denying release and setting a 24-month deferral.

Before each of Sanders's hearings the parole commission received significant input from the law enforcement community and the public at large, largely urging the commission to deny parole. At each of Sanders's parole reviews, the chairperson reviewed and accepted the recommendation of the assigned commissioner. As a result, all of Sanders's parole decisions up to this point have been the result of a consensus between at least two members of the commission.

Sanders has completed all the necessary programming that is available to him and has maintained very good conduct in prison since 1987. Although the parole commission has made positive comments about him, it has continued to deny him parole on the grounds that he would pose an unreasonable risk to the public and he has not served sufficient time for punishment.

5

OPINION

Sanders brings two claims: 1) applying Wis. Admin. Code § PAC 1.06(2) in his case violates the ex post facto clause of the United States Constitution because it allows for parole review deferrals longer than 12 months, whereas the regulation in place when Sanders was sentenced did not; and 2) the state has violated the ex post facto clause by its "cumulative application" of the post-1973 administrative changes to the structure of the parole commission, the grant of discretion to the parole chairperson to approve deferrals of more than 12 months and regulations allowing for input from victims and the public.

Defendants have moved for summary judgment on both of Sanders's claims, while Sanders appears to seek summary judgment solely on his cumulation theory.

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party. *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007). Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Before addressing Sanders's specific claims, it is helpful to put them in context. First, as an inmate serving a life sentence, Sanders has no liberty interest in being released on parole. *Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006). Wisconsin's parole system, both at the time Sanders was sentenced and in its present form, leaves the decision whether to release an inmate serving a life term wholly to the discretion of the parole commission, which means that "no fact that [Sanders] could prove at a hearing would entitle him to release." *Id.*; Wis. Stat. § 304.06(1)(b) (parole commission "may" parole an inmate serving a life term when he or she has served 20 years).

Second, throughout the relevant time period, the parole commission's range of discretion has remained unchanged. The few regulatory limits on that discretion constrain when the commission may *grant* parole, not when the commission may deny it.[4] In other words, from the day Sanders first began serving his sentence, he constantly has faced the possibility that the parole commission would exercise its discretion in a manner that would cause him to serve the rest of his life in prison.

Nevertheless, Sanders contends that certain regulations enacted after his conviction as applied have significantly decreased his ability to obtain release on parole, violating the constitutional proscription against ex post facto laws. Statutes and regulations governing parole are "laws" for purposes of the ex post facto clause. *Garner v. Jones*, 529 U.S. 244, 250 (2000); *California Dep't of Corrections v. Morales*, 514 U.S. 499, 508-09 (1995). Whether retroactive application of a particular change in parole law violates the prohibition against ex post facto laws

---

[4] *See* Wis. Admin. Code § PAC 1.06 (commission may recommend or grant parole only if the inmate meets five enumerated criteria).

7

is "a matter of degree" (*Morales*, 514 U.S. at 509) that must take into account a state's need for flexibility in formulating parole procedures and addressing problems associated with confinement and release, *Garner*, 529 U.S. at 252. The controlling inquiry is whether the new rules create "a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id*. at 250 (quoting *Morales*, 514 U.S. at 509).

Sanders may prove this in one of two ways: first, he may show that the changes to the parole rules, on their face, show a significant risk of increased incarceration. *Id*. at 255. Second, he may adduce "evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Id*. Sanders is proceeding solely under the second approach. As discussed below, the evidence does not support his claim.

### I. Wis. Admin. Code § PAC 1.06(2)

Sanders's stand-alone challenge to Wis. Admin. Code § PAC 1.06(2) merits little discussion. As Sanders acknowledges, regulatory enactments that increase the time between parole hearings for periods even *greater* than two years have withstood ex post facto challenges. *E.g.*, *Garner*, 529 U.S. at 250 (upholding Georgia administrative regulation changing frequency of parole hearings for prisoners serving life sentences from every three years to every eight years); *Morales*, 514 U.S. at 509 (upholding California law changing frequency of reconsideration for parole from every year to up to every three years for prisoners convicted of more than one homicide); *Adams v. Meloy*, 287 Fed. Appx. 531, 2008 WL 2812603, *3 (7th Cir. 2008)

(Indiana's change in frequency of parole hearings from annually to once every five years did not violate ex post facto clause) (nonprecedential disposition).

Wis. Admin. Code § PAC 1.06(2) is less onerous than the rules found constitutional in those cases. It does not change the frequency of parole reviews across the board; to the contrary, it retains the "old" presumption of a 12-month deferral, but authorizes longer deferrals with the approval of the chairperson. In fact, as plaintiff concedes, deferrals of between four and twelve months remain the most common. *Garner*, 529 U.S. at 256 (noting that parole board's internal policy statements provide important instruction as to how agency interprets its enabling regulations).

Faced with these facts and authorities, Sanders does not attempt to argue that Wis. Admin. Code § PAC 1.06(2), by its terms, creates a significant risk of increased incarceration. Instead, he argues that the effect of the rule allowing 24-month or greater deferrals must be examined in practice, specifically, in conjunction with the effect it has had on his security classification. According to Sanders, the parole commission will not parole an inmate until he has served some time in minimum security, but the Program Review Committee will not place an inmate on minimum security until it receives a signal from the parole commission that the inmate is a candidate for parole. This "signal," according to Sanders, is a parole deferral of 12 months or less. Now that Wis. Admin. Code § PAC 1.06(2) allows the parole commission to defer Sanders's parole consideration for more than 12 months, the regulation has empowered the commission constructively to prevent Sanders's placement in a minimum facility and thereby prevent him from ever earning parole.

In support of this claim, Sanders relies heavily on a chart showing that most inmates serving life sentences received deferrals of 12 months or less during defendant Graham's tenure and that only three inmates who received deferrals of 18 months or more served more time than Sanders. This chart was prepared by Michael Brondino, Ph.D., a statistician at the University of Wisconsin-Milwaukee, whom Sanders has offered as an expert in this case. Although defendants raise evidentiary objections to Brondino's report, it is unnecessary to resolve them because Brondino's report is not material. The fact that Sanders has not been released or approved for a 12-month deferral in contrast with most of the lifers imprisoned between 1969 and 1989 is, by itself, irrelevant. The operative question is *why* Sanders has been held longer than most prisoners. Brondino's report shows simply that Sanders is near the top of the chart; it does nothing to suggest, let alone establish, that Sanders's prolonged incarceration results from the 1981 and 1989 changes to the parole rules. *Accord Foster v. Booker*, 595 F.3d 353, 365 (6th Cir. 2010) (statistics purporting to show decrease in average annual rate of parole or increase in average years served at parole since new parole board took office did not support ex post facto claim because it was impossible to tell whether changes were due to challenged statutory changes to parole process or to board's stricter exercise of its discretion).

Although defendants dispute Sanders's assertion that the parole commission has the power to influence the Program Review Committee's security determinations and vice versa, this factual dispute is not material. As defendants point out, Sanders alleges that this symbiotic relationship existed even under the old system, in which a 12-month deferral signaled the PRC that the commission did not consider an inmate ready for parole. The only change in the new system is signal recalibration: now a 24-month deferral is the commission's signal that an inmate

10

is not parole-ready, which allegedly is the PRC's cue not to reduce that inmate's security classification. Against this backdrop, Sanders asserts a constitutional right to have his deferrals limited to 12 months under the old scheme and then used straight-up by the PRC in the new scheme, where a deferral *longer* than 12 months is the new signal that an inmate is not parole ready. Sanders predicts that this will cause the PRC to reclassify him to minimum security, which in turn will give him a genuine shot at being paroled by the commission at his next hearing. Sanders's logic is flawed.

First, nothing in the ex post facto clause entitles Sanders to mix-and-match the most favorable features of the old system and the new system in order to maximize his chance of obtaining a minimum security rating from the PRC. If there were an ex post facto violation here, then the remedy would be to continue to employ the system–the *entire* system–that was in place when Sanders was sentenced. This would provide no benefit to Sanders because under this system, a 12-month deferral means that the parole commission view an inmate as not ready for parole. Absent a commission decision to drop Sanders' deferral *below* 12 months, Sanders gains nothing.

Which segues to Sanders's second, intertwined problem: even if this court were to indulge Sanders by ordering a 12-month deferral in a system that now allows 24-month deferrals, he would be no closer to parole than he is now. Assuming *arguendo* that the PRC takes cues from the commission's deferral decisions, it would not take a cue from a shorter deferral created by judicial fiat. *Ceteris paribus*, the PRC would be unmoved by a deferral date set by an outside entity with no direct experience or expertise in the fields of institutional security,

11

rehabilitation and parole. In this circumstance, the 12-month deferral would be a meaningless number.

Third, Sanders does not claim that the commission has denied him parole because he has not spent time in minimum security. As Sanders admits, his main problem with the commission is its view that he has not yet served sufficient time as punishment for his horrific crimes. The essence of Sanders's claim is that, by repeatedly deferring his next review for 24 months, the parole commission is signaling that it is not likely to paroled him any time soon. But the commission's consistent, rigorous exercise of discretion that it always has possessed does not violate the ex post facto clause. As the Court explained in *Garner*, 529 U.S. at 253:

> [W]e can say with some assurance that where parole is concerned, discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

Sanders has failed to show that he faces a risk of a longer period of incarceration as a result of Wis. Admin. Code § PAC 1.06(2) than he faced under the earlier policy that limited deferrals to 12 months. Therefore, defendants are entitled to summary judgment on his challenge to Wis. Admin. Code § PAC 1.06(2).


**II. Cumulative Application Theory**

Sanders argues that even if the rule permitting longer deferrals does not by itself violate the ex post facto clause, this rule accrues greater punitive force when combined with the 1989

legislation that changed the chair of the parole board from a civil servant to an appointed official and with rules allowing victims and the public to provide input to the parole commission.

With respect to the change in the structure and composition of the parole board, Sanders argues:

> Now the chairman of the parole commission is a political appointee, and the parole commission is no longer a non-political organization. Each chairman must be concerned not only with the safety of society and the releasing prisoners at the best time, but also with the political ramifications of his decision. This means that, in addition to the statutory factors for granting parole that are stated in Wis. Admin. Code § PAC 1.07, the political ramifications for granting parole may be taken into consideration when granting or denying parole.

Pltf.'s Br. in Opp., dkt. 93, at 13.

Sanders's argument fails for several reasons.

First, Sanders is incorrect when he asserts that the decision whether to defer an inmate's parole consideration for more than 12 months is "made by a single politically-appointed chair." As defendants observe, although the chairperson must approve a deferral longer than 12 months, the commissioner who is assigned to the case makes the initial deferral decision. Each time the parole commission deferred Sanders, the chairperson reviewed and accepted the recommendation of the commissioner in charge of Sanders's parole hearing. Thus, Sanders's characterization of both the hypothetical and the actual power wielded by the chairperson is overstated. Sanders's own parole review history undermines his claim that a politically appointed chairperson has increased his risk of being imprisoned longer.

Second, Sanders has submitted no evidence that politics has influenced the parole decisions by defendant Graham or any of his predecessors. Plaintiff cites the example of Leonard Wells, the former parole chairperson who resigned amidst public outcry over his decision to

13

parole two inmates convicted of murdering a police officer. It is unclear why Sanders thinks this proves his point. Sanders does not explain why a civil servant faced with a similarly difficult and unpopular parole decision would not face and succumb to the same pressures that caused Wells to resign. Sanders does not explain why converting the chair position to a political appointment would not be as likely to result in a more liberal parole policy. Defendants point out that Sanders has been reviewed by parole commissions headed by chairs appointed under both Democratic and Republican governors but the concerns about his release have been the same. *See Noel v. Wells*, 2005 WL 2297149, *4 (W.D. Wis. 2005) (noting that "a single [commissioner] is just as likely to be biased *toward* him as biased against him.") (emphasis in original).

Sanders implies that defendant Graham is biased against him because Graham is a former Milwaukee police officer. Even if this were true, it doesn't advance the ex post facto analysis because the chairperson's views and opinions are not a result of the restructuring of the commission. Even if the chairperson were a civil servant, he or she still could have a background in law enforcement or other training and experience that would affect his or her views on parole. Circling back to a previous point, there is no new structural impediment to the governor appointing a pro-inmate social worker as the commission's chair. In short, there is no nexus between the structural changes to the commission and the chair's philosophy and opinions. If Sanders thinks Graham has a conflict of interest, then Sanders should seek relief in a state forum. A claim of personal bias is not a basis for a federal ex post facto claim.

The nub of Sanders's claim is that there has been a "change in the philosophy of the parole board," from optimizing a prisoner's time to focusing solely on public safety, which

Sanders sees as going "hand in hand" with the restructuring of the parole commission.  *See* Dkt. 93, at 14.  But as the court explained in *Grennier*, an inmate

> has no more entitlement to a liberal release policy than he would have had to be sentenced by a judge who favored home confinement over prison.  The constitutional interest is in the rules and statutes – the 'laws' to which [the ex post facto clause] refers – rather than the attitudes of public officials who administer a discretionary system.  Parole officials who become more concerned with public safety . . . do not violate the Constitution.

453 F.3d at 445.

*See also Foster*, 595 F.3d at 363 (policy of Michigan's new parole board to place greater emphasis on inmate's underlying offense and less on rehabilitation when making parole decisions did not violate ex post facto clause); *Garner*, 529 U.S. at 259 ("the *Ex Post Facto* Clause gives [a prisoner] no cause to complain that the Board in place at the time of his offense has been replaced by a new, tough-on-crime Board that is much more parsimonious with parole") (Scalia, J., concurring in part in the judgment).  Because Sanders cannot show a risk of increased incarceration due to a retroactive regulatory change as opposed to a change in the manner in which the parole commission exercises its discretion, his ex post facto challenge fails.

Sanders's remaining challenges to alleged "new" parole procedures fail because these procedures aren't really new.  Sanders points to the rules allowing victims and concerned citizens to provide input to the commission, but he has not established that this input was prohibited in 1973.  Contrary to Sanders's assertion, the fact that such community input is not mentioned explicitly in the publication "Parole in Wisconsin," which the parties appear to concede reflected the parole board's practices in 1973, does not prove that it was not considered.  In fact, Sanders's own submissions show that such evidence *was* considered before promulgation of the

15

parole rules in 1981. The Wisconsin Department of Health and Social Services--Parole Board Manual of Policies and Procedures, dated March 1976, states:

> Interested citizens and attorneys may, however, present their views regarding the application by letter or in person (by appointment) at the Parole Boards offices. A memorandum to file regarding any such contact will be prepared for the permanent record by the members of the Board contacted. Letters stating viewpoints will likewise become part of the parole applicant's [Central Records Unit] file.

Presumably, "interested citizens" would include victims. Accordingly, Sanders has not shown any change in the parole rules that could extend his confinement.

Even assuming, *arguendo*, that the current rule allowing victims to provide "direct input" into parole decisions is "new," this does not violate the ex post facto clause. Reviewing a statute analogous to Wis. Stat. § 304.06(1)(em) in *Mosley v. Klincar*, 947 F.2d 1338 (7th Cir. 1991), the court found that the district court had properly dismissed the plaintiff's ex post facto clause challenge to a victim notification statute, explaining that "Only the 'alteration of a substantial right' is prohibited by the ex post facto clause." *Id*. (quoting *Weaver v. Graham*, 450 U.S. 24, 29 n. 12 (1981)). The court continued:

> The retroactive application of the statute in this case did not adversely affect any of Mosley's "substantial, personal rights." Rather, this statute simply revised existing parole procedures by requiring the Parole Review Board to notify crime victims of a prisoner's scheduled parole hearing; it did not criminalize previously innocent acts, increase the punishment for a prior crime, or alter the degree of proof necessary to establish Mosley's guilt. Moreover, the notice requirement did not affect the criteria the Parole Review Board used in determining whether a prisoner was entitled to parole; indeed, even under the statute in force at the time Mosley committed his offense, victims were not prohibited from offering their statements to the Parole Review Board, should they have chosen to do so.

947 F.2d at 1340.

As in *Mosley*, the rule allowing victims to provide direct input to the parole commission did not alter the criteria used to determine whether Sanders is entitled to parole and did not otherwise affect the parole commission's exercise of discretion.  At most, allowing victim input, to the extent it can be described as "new," is an "ambiguous sort of disadvantage" insufficient to establish a claim under the ex post facto clause.  *Garner*, 529 U.S. at 255.

In sum, whether evaluated individually or in combination, the procedural changes on which Sanders rests his ex post facto claims either are not "new" or fail to pose any risk of increasing his period of confinement.  Therefore, defendants are entitled to summary judgment on his claims.

ORDER

IT IS ORDERED that plaintiff Ben Sanders's motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 27th day of May, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge